FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
Southern Division

98 JUL 17 AM 11:30

U.S. DISTRICT COURT
N.D. OF ALABAMA

P. RAMONA WASHBURN,  )
    Plaintiff(s);  )
                )
-vs.-  )    No. CV-95-P-1601-S
                )
ALABAMA LABELS & GRAPHICS  )
CORPORATION,  )
    Defendant(s).  )

**ENTERED**

**JUL 17 1998**

**Opinion**

Defendant's Motion for Summary Judgment was considered at a hearing in August 1996. For the reasons stated below, the court has concluded that the motion is due to be granted.

### Statement of Facts[1]

This action arises out of the sale of Alabama Labels & Graphics Corporation ("ALGC") to new owners, changes in management of the company following the sale, and the new management's decision to terminate the plaintiff, P. Ramona Washburn ("Washburn"), one of the former owners of the company.

Until 1986, ALGC was owned in part and managed by plaintiff and two of her friends, Remelle Davis ("Davis") and Mary Helms ("Helms"). Davis served as President of ALGC, Helms served as Vice President and Production Manager, and Washburn — who had begun working at ALGC full time in 1978 — served as Vice President and General Manager. Davis and Helms's husbands also owned stock in ALGC.

---

1. The recitation of "facts" is based upon the materials submitted viewed in the light most favorable to the plaintiff.

In 1986, several investors, including David Ehrhardt ("Ehrhardt"), bought 100% of the stock of ALGC. As part of the sale, Ehrhardt received 25% of the stock in ALGC and Washburn and the other shareholders each received several hundred thousand dollars. Because Ehrhardt and the other new owners wished to retain Davis, Helms and Washburn for purposes of managing the business and training the new owners in the details of the business, ALGC entered into three-year employment contracts with each of the former owners. The contracts specified that, at the conclusion of the three-year term, each former owner would be considered an employee-at-will. The contracts also provided that Davis, Helms and Washburn would not compete with ALGC following their separation from the company.

In December 1991, Ehrhardt purchased another 25% of the stock of ALGC (for a total of 50%), and the remaining investors sold the balance of the shares to Jamey McMahon ("McMahon"). At this time, Ehrhardt was in his early 30's and McMahon was in his late 20's.

In July 1992, Ehrhardt became President of ALGC, and Davis — who had remained as President since the 1986 acquisition — became Chairman of the Board. In December 1992, Davis retired from ALGC.

Early in 1993, Ehrhardt met with Washburn to discuss her job performance. Ehrhardt provided Washburn with a written job description, and both Ehrhardt and Washburn understood that Washburn's job duties, responsibilities, and compensation would remain the same. However, because Ehrhardt decided to refer to himself as "General Manager" rather than as "President," he and Washburn agreed that Washburn's title would be changed from "General Manager" to "Resource Manager." Ehrhardt and Washburn agreed that Washburn's performance would be evaluated informally as needed, much as it had been during Davis's leadership of ALGC.

2

In March 1993, based on performance problems, Ehrhardt requested that Helms resign her position. Helms did so without stating any disagreement; upon her resignation, Helms received severance pay and continued medical insurance. Following Helms's resignation, McMahon became the Production Manager.

Also in 1993, Helms and Washburn requested that ALGC prepay the remaining balances on unsecured notes issued by the new owners of ALGC to Helms and Washburn in connection with the 1986 stock buy-out. Although the terms of the notes did not require prepayment on demand, Ehrhardt and McMahon voluntarily paid the remaining balances — in the case of Washburn, approximately $239,000 — due under the notes.

From 1991 to 1993, Washburn received an annual raise of approximately $2000; in 1994, her base compensation remained the same as it had been in 1993.

In late 1994, Susan Blankenship, an employee of one of ALGC's competitors, IPI, called McMahon regarding information that she thought would be of interest to ALGC management. Blankenship indicated that she and McMahon should meet offsite, since Washburn might observe the meeting and inform Davis — who had begun working for IPI, apparently in spite of her non-compete agreement with ALGC — that Blankenship had visited ALGC. At their meeting, Blankenship informed McMahon that Davis had begun working for IPI in 1993, that Blankenship had seen Washington visit Davis at IPI on approximately four or five occasions, and that IPI had been able to obtain ALGC's pricing on products. Blankenship showed McMahon canceled commission checks from IPI to Davis and Davis's expense reports showing her visits to key ALGC accounts.

In response to this information, Ehrhardt decided to file suit against Davis to force her to

3

comply with the non-compete agreement that she had previously signed with ALGC. Because Washburn was a former business partner and longtime friend of Davis, Ehrhardt concluded that it would be unwise to continue to employ Washburn during the litigation against Davis. Washburn was terminated on December 1, 1994, and was paid 30 days' severance pay and her bonus for 1994, which ordinarily would have been paid in March 1995.

Following Washburn's termination, her position at ALGC was eliminated, and her duties were either eliminated — due to increasing automation and computerization of ALGC's quoting and purchasing processes — or redistributed among various ALGC employees. Washburn's personnel duties were assigned to McMahon.

In June 1995, Washburn filed this action, alleging ALGC's violation of the Age Discrimination in Employment Act ("ADEA") and Title VII of the Civil Rights Act of 1964. Washburn's complaint alleges that she was subjected to discrimination on the basis of age and sex with respect to compensation, harassment, discipline, benefits, layoffs, seniority and other terms and conditions of her employment.

In her deposition, Washburn testified as to one incident in which, after she slipped and fell at work, McMahon joked that ALGC should install handrails for the elderly. Washburn also testified that some management personnel occasionally made jokes or other remarks of a sexual nature during her tenure at ALGC. Washburn testified that ALGC discriminated against her on the basis of age and sex because 1) she was not evaluated or given a raise in 1994 and 2) she was terminated for no apparent reason.

Plaintiff has submitted affidavits of six current or former employees of ALGC in opposition to defendant's Motion for Summary Judgment. These affidavits affirm Washburn's

reputation as a hard worker, reference various instances of alleged age or sex discrimination by ALGC management against other employees, and conclude that the terminations of Washburn, Davis, and Helms were all the product of a pattern of age and sex discrimination at ALGC.

## Analysis

### I. Hostile Work Environment

To prevail on a hostile work environment claim of sexual harassment, a plaintiff must satisfy the standard set forth in *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993). Specifically, a plaintiff must show 1) that the alleged conduct was severe or pervasive enough to create a hostile or abusive work environment, 2) that the environment must be, in objective terms, one that a reasonable person would find hostile or abusive, and 3) that the environment was, in fact, perceived by the plaintiff as hostile or abusive so as to actually alter the conditions of the plaintiff's employment. *Id.* at 21-22. "'Mere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview." *Id.* (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).

In this case, plaintiff has alleged that the activities engaged in ALGC created a hostile work environment for older and female workers. Washburn recalled one incident in which McMahon joked — after Washburn slipped and fell at work — that handrails for the elderly should be installed at ALGC. Washburn also testified that, at one management meeting, some members of the staff discussed penises and penis pumps. However, nothing in Washburn's deposition

5

testimony indicates that these two instances were anything more that stray remarks. Indeed, Washburn herself laughed at the handrail remark, and she indicated in deposition that she found the discussion of penises and penis pumps "inappropriate behavior . . . for a meeting in mixed company." The court concludes that no reasonable person could find these isolated, joking remarks sufficiently outrageous or upsetting to create a hostile work environment.[2]

## II. Compensation

Although Washburn's complaint alleges that age and sex discrimination affected her compensation level, little of her deposition testimony lends support to that claim. In deposition, Washburn expressed the belief that she should have received an employee evaluation and a raise in 1994. As noted above, Washburn was awarded an annual raise of approximately $2000 from 1991 to 1993, ALGC voluntarily paid off nearly $240,000 in indebtedness to her in March 1993, and ALGC paid Washburn 30 days' severance pay and her annual bonus for 1994 when she was termination on December 1, 1994. Washburn never requested an evaluation. In light of these facts, and Washburn's complete failure to draw a connection between ALGC's failure to give her an evaluation or a raise in 1994 and any alleged discriminatory intent, the court concludes that plaintiff has produced no material evidence of discrimination in compensation.

## III. Discipline, Benefits, Seniority, Layoffs, and Other Terms and Conditions of Employment

The court's review of the materials presented by the parties indicates that plaintiff has

---

2. Given the almost total lack of testimony by Washburn supporting a hostile work environment claim, it is perhaps unsurprising that plaintiff has submitted affidavits of various former ALGC employees listing purported instances of inappropriate sexual behavior, sexual comments, or age-related statements by members of ALGC management. Although these instances might form the basis for a complaint of sex or age discrimination by the *affiants*, none of the affidavits — which consist largely of conclusory and/or hearsay statements — assists the court in determining whether *this plaintiff* experienced a hostile work environment.

failed to establish even a prima facie case of discrimination in connection with discipline, benefits, seniority, layoffs, or other terms or conditions of her employment. In deposition, Washburn conceded that no discipline was ever imposed upon her, that she was not discriminated against on the basis of employee benefits (with the exception of losing her 401(k) benefits as part of her termination), that she was not discriminated against in terms of seniority, and that there was never a layoff at ALGC. Based on the complete lack of evidence supporting any of these claims, it appears that they were included merely as boilerplate in plaintiff's complaint.

## IV. Demotion

Washburn's demotion claim stems from Ehrhardt decision, in early 1993, to change Washburn's job title from General Manager to Resource Manager. In deposition, Washburn testified that she agreed to the change in job title suggested by Ehrhardt, since Ehrhardt had decided to change his own job title from President to General Manager. She further testified that her actual job duties were not diminished as a result of the title change; indeed, she estimated that her duties in fact *increased* at that time. Moreover, this "demotion" occurred in early 1993, nearly two years before Washburn filed her EEOC charge. The court concludes that plaintiff has failed to establish the elements of a prima facie claim of demotion.

## V. Termination

Absent direct evidence of discrimination, a plaintiff in a termination case must establish a prima facie case by showing that (1) she is a member of a protected class, (2) she applied for and was qualified for the job, (3) despite her qualifications, she was rejected, and (4) the position remained open or was filled by a person outside the protected class. *Eskra v. Provident Life and Acc. Ins. Co.,* 125 F.3d 1406, 1411 (11th Cir. 1997). In an ADEA action, the plaintiff is not

7

required to show that the replacement employee was under the age of 40, and outside the protected class. *O'Connor v. Consolidated Coin Caterers Corp.*, 116 S. Ct. 1307, 1310 (1996).

"If a prima facie case is established, the inference is raised that discriminatory intent motivated the adverse employment action, and the burden shifts to the employer 'to clearly articulate . . . a legitimate non-discriminatory reason' for the adverse action. If the employer satisfies this burden, the burden again shifts to the plaintiff to show that the proffered reason is a pretext for the true discriminatory reason." *Eskra*, 125 F.3d at 1411 (quoting *O'Connor*, 116 S. Ct. At 1310). To survive a defendant's motion for summary judgment, a plaintiff need not *prove* pretext; rather, the plaintiff must merely put forth sufficient evidence to "allow a jury to find by a preponderance of the evidence that the plaintiff has established pretext. . . . The only issue to be considered by the judge at summary judgment is whether the plaintiff's evidence has placed material facts at issue." *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 921 (11th Cir. 1993). Where evidence of discriminatory intent is entirely lacking, summary judgment is appropriate. *Id.*

For purposes of this motion, the court will assume that plaintiff has satisfied her initial burden of producing prima facie evidence of age and sex discrimination.[3] The questions before the court, then, are 1) whether ALGC has articulated a legitimate, non-discriminatory reason for terminating Washburn and, 2) whether a jury could conclude that ALGC's proffered reason was,

---

3. In support of its motion, defendant submitted evidence indicating that Washburn's performance was unsatisfactory and that, following her termination, her duties were eliminated or assigned to a number of other employees. However, plaintiff claims that her job duties were reassigned to McMahon and Michael Cornelius, both of whom were younger male employees. Because it is plaintiff's version of the facts which must control on this motion, the court will assume both that Washburn was qualified for her position and that she was replaced by younger males.

8

in fact, pretextual. In this case, the court has concluded both that ALGC's proffered reason for terminating Washburn is worthy of credence and that, based on the evidence submitted by plaintiff, no jury could reasonably conclude that ALGC's proffered reason for terminating Washburn was pretextual.

In 1986, when Ehrhardt and other investors purchased ALGC from Davis, Helms and Washburn, the company entered into three-year employment contracts with the former owners, each of whom was then over 45 years of age. Although those contracts expired in 1989, ALGC continued to employ all three women through 1992. It appears that both Davis and Helms voluntarily resigned their positions with ALGC.[4/] Moreover, in March 1993, Ehrhardt and McMahon agreed to pay off the remaining balances on promissory notes issued to Helms and Washburn in connection with the 1986 sale of the company; for Washburn the amount of this voluntary prepayment was nearly $240,000. While these background facts are hardly determinative, they do provide a context for the relationship between Washburn and her employer, and it is appropriate for the court to consider such facts along with evidence presented by plaintiff to show pretext.

The court has concluded that plaintiff has failed to rebut the legitimate, nondiscriminatory reason proffered by ALGC for Washburn's termination. Plaintiff does not dispute that Blankenship spoke to McMahon concerning 1) Davis's sales activities for IPI in violation of her non-compete agreement, 2) the fact that IPI was able to obtain confidential pricing information

---

4. Certainly, various of the affidavits submitted by plaintiff in opposition express opinions that Davis and or Helms were "forced out" of ALGC as a result of age and/or sex discrimination. However, these conclusory allegations cannot reasonably be considered as a basis for a dispute of material fact that would preclude summary judgment.

9

concerning ALGC's business, or 3) Washburn's several visits to Davis at IPI. Although plaintiff hotly disputes the *truth* of the information given by Blankenship to McMahon, the truth or falsity of those allegations is largely irrelevant to the court's decision here. The key question is whether McMahon and Ehrhardt terminated Washburn because they *believed* the information provided by Blankenship. That Ehrhardt and McMahon did, in fact, believe the information concerning Davis seems beyond dispute, since ALGC subsequently pursued litigation against Davis. Under these circumstances, the court concludes that any reasonable jury would be hard-pressed to disbelieve ALGC's proffered legitimate, non-discriminatory reason for terminating Washburn.

In her attempt to rebut ALGC's proffered reason, plaintiff has submitted her own affidavit and affidavits of various former employees of ALGC. While affidavits are certainly an acceptable means of submitting evidence to the court, close examination of the affidavits submitted by plaintiff here reveals a body of conclusory and largely hearsay statements purporting to establish that Washburn was a hard worker at ALGC, that Davis and Helms and Washburn were "forced out" of the company because of age, that discriminatory comments about and treatment of women and older persons were frequent occurrences at ALGC, and that sexual comments and conversations were common at ALGC. Were this a class action by the affiants, this shotgun approach to establishing pretext might be plausible. However, the court concludes that nothing in the affidavits or deposition testimony submitted by Washburn creates a material dispute of fact as to the basis for *her* termination. Plaintiff has failed to provide the court with any reasonable basis for disbelieving that ALGC terminated Washburn as a result of her association with and loyalty to Davis.

10

### Conclusion

Plaintiff has failed to present a prima facie case of age and/or sex discrimination by ALGC relating to compensation, promotion, seniority, layoffs, and benefits. She has failed to establish a prima facie case of sex-based or age-based hostile work environment. She has failed to provide the court with any basis for disbelieving ALGC's proffered reason for her termination. Accordingly, summary judgment is due to granted to ALGC on all of plaintiff's claims.

Dated: July 17, 1998

Chief Judge Sam C. Pointer, Jr.

Service List:
    Ms. Cathy S. Wright
    Mr. Warren B. Lightfoot, Jr.
    Mr. Andrew P. Campbell
    Mr. David M. Loper